UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | | |
|---|---|---|
| BLOODSTOCK RESEARCH | ) | |
| INFORMATION SERVICES, INC., | ) | |
| n/k/a RFB DATA, INC., | ) | Civil Action No. 5:07-140-JMH |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OPINION** |
| v. | ) | **AND ORDER** |
| | ) | |
| EDBAIN.COM, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

\*\*    \*\*    \*\*    \*\*    \*\*

This matter is before the Court on Defendant John Johnson's Motion for Summary Judgment [Record No. 62].  Plaintiff responded and Defendant Johnson replied [Record Nos. 63, 66].  Accordingly, this matter is ripe for review.  Plaintiff claims that Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, by defrauding Plaintiff of money and property through the repackaging and resale of proprietary information without Plaintiff's permission.  Plaintiff also raises a breach of contract claim under the Court's supplemental jurisdiction, 28 U.S.C. § 1367.  For the reasons stated herein, Defendant's Motion for Summary Judgment will be denied.

**I. BACKGROUND**

Plaintiff Bloodstock Research Information Services, Inc. ("Bloodstock"), is a Kentucky corporation with its principal place of business in Lexington, Kentucky.  Bloodstock provides thoroughbred horse racing data to breeders and handicappers via an

online system, Brisnet.com.  Bloodstock acquired its daily racing form data from a similar service for a fee.  In turn, Bloodstock produced proprietary reports designed to aid thoroughbred horse racing handicappers.  Accessing racing statistics electronically allowed handicappers to avoid compiling statistics by hand using racing charts and forms from tracks across the country.  Customers could establish online accounts, using a user name and password, to access information after agreeing to the terms and conditions listed in Bloodstock's Membership Agreement.

>   The Membership Agreement provides, in pertinent part:
>
>   CUSTOMER'S RESPONSIBILITIES AND WARRANTIES.  It is expressly understood that **no part of any information received from [Bloodstock] may be reproduced, resold, published, transmitted, disseminated, distributed or commercially exploited by the Customer** in its existing or any altered form or by any means, including, without limitation, electronically or mechanically, without the prior written consent of [Bloodstock].  Customer agrees not to use the information to conduct any commercial business without the prior written consent of [Bloodstock] or any activity prohibited by law.  Customer acknowledges that **the assigned username and/or password is for Customer's personal use and Customer agrees not to transfer or assign, or permit any third party to directly or indirectly use, said username and/or password**.

[Pl.'s Resp., Ex. 2, at 2] (emphasis added).

Defendant Ed Bain ("Bain") is a professional thoroughbred handicapper allegedly of some repute.  In the past, and using a proprietary method of his own, Bain sold handicapping reports for public consumption based on racing statistics purchased by arrangement from certain online services similar to Bloodstock.

However, Bain's relationship with the racing statistics providers allegedly soured.  In April 2006, Bain launched a new venture to sell his handicapping information via the internet.  He formed edbain.com, LLC, another named Defendant, to operate the website. Bain reportedly created new software that allowed him to input racing statistics and produce his handicapping reports.

In April 2006, Bain accessed Bloodstock's database and downloaded information.  He allegedly used this information to create his own reports and resell them on edbain.com.  In June 2006, Bloodstock contacted Bain and told him to refrain from reselling information from its online database, in violation of the Bloodstock Membership Agreement.  Bloodstock also warned Bain's wife, Defendant Susan Sweeney ("Sweeney"), to refrain from reselling Bloodstock information.  From that point, Bloodstock monitored Bain's usage of the online database by seeding certain information through its system and waiting for it to appear on edbain.com.

Defendant John Johnson ("Johnson"), the sole party moving for summary judgment, is a New York resident and horse racing handicapper.  [Johnson Dep. 7.]  Johnson was a Bloodstock customer since 1996 and was bound by the Membership Agreement.  [Johnson Dep. 8-9.]  Johnson testified that he met Bain sometime between 1995 and 1997, and that they later became friends, but saw each other only twice in a ten to twelve year period.  [Johnson Dep.

12.]  Johnson knew that Bain worked as a professional handicapper and that he produced handicapping reports to sell.  Johnson knew that Equibase, a racing statistics provider, offered to permit Bain to resell its data in his reports for $60,000-$70,000 per year. [Johnson Dep. 24.]  On June 27, 2006, in an email, Bain proposed that Johnson join his venture at a cost of $60,000 to $70,000 per year.  [Johnson Dep. 28-29.]

In July 2006, Bain contacted Johnson by telephone and asked him to download racing information from Bloodstock's database. Johnson knew that Bloodstock had cut off Bain's access because of a dispute about who owned the information and had the right to repackage and resell it.  [Johnson Dep. 30-31.]  Johnson testified that when he accessed Bloodstock's database, it was for recreational use, but when Bain accessed the database, it was for business.  [Johnson Dep. 34.]  Bain agreed to pay Johnson to access Bloodstock's database, but Johnson never received reimbursement and continued to pay for the account.  [Johnson Dep. 31, 33-34.] Johnson supplied Bain with his user name and password so that Bain could access Bloodstock's database as needed.  [Johnson Dep. 34.] Bain accessed Bloodstock's database for over ten months, using Johnson's account.  On July 11, 2006, Bain informed Johnson via email that he enlisted others to access the racing statistics for him.  [Johnson Dep. 36-37.]  Sweeney allegedly found a program to mask computer IP addresses in order to surreptitiously access

-4-

Bloodstock's database.   [Johnson Dep. 37.]

On May 15, 2007, Bloodstock filed suit against Defendants,
averring RICO and breach of contract claims.   On May 22, 2007,
Johnson asked Bain to stop accessing Bloodstock's database.
[Johnson Dep. 48.] Bloodstock claims that Defendants violated RICO
by using the internet to defraud, by scheme or artifice, Bloodstock
of money and property in the form of its proprietary race
handicapping data.  Bloodstock also claims that Defendants breached
the Membership Agreement by reselling information from its online
database as Defendants' own.   Defendant Johnson moved this Court
for summary judgment against Bloodstock, arguing (1) that
Bloodstock lacked standing or, alternatively, that the controversy
was moot because Bloodstock sold assets to another company, (2)
that Bloodstock cannot prove the elements necessary to establish a
civil RICO claim, and (3) that Bloodstock cannot prove damages in
its breach of contract claim.  In the alternative, Johnson asks the
Court to decline to exercise supplemental jurisdiction over
Bloodstock's state law claims should the Court decide to dismiss
its RICO claim.  No other defendant has moved for summary judgment.

## II.  STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions,
answers to interrogatories, and admissions on file, together with
the affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to a

-5-

judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden is met by showing the court that there is an absence of evidence on a material fact on which the nonmoving party has the ultimate burden of proof at trial. *Id.* at 325. The burden then shifts to the nonmoving party to "come forward with some probative evidence to support its claim." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994) (citations omitted). The Court must construe the evidence in the light most favorable to the nonmoving party, in this case, Bloodstock. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Multimedia 2000, Inc. v. Attard*, 374 F.3d 377, 380 (6th Cir. 2004). A mere scintilla of evidence is insufficient; rather, "there must be evidence on which the jury could reasonably find for" the non-moving party. *Anderson*, 477 U.S. at 252.

**III.  ANALYSIS**

**A.  Standing and Mootness**

In the instant matter, Johnson argues that Bloodstock lacks standing to sue in federal court. At the heart of the doctrine of standing is the constitutional "case or controversy" requirement. *Kardules v. City of Columbus*, 95 F.3d 1335, 1343 (6th Cir. 1996). Article III standing is satisfied by showing (1) that the plaintiff has suffered an "injury in fact" that is (a) concrete and

-6-

particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that a favorable decision is likely to redress the injury. *Cleveland Branch, NAACP v. City of Parma, Ohio*, 263 F.3d 513, 523-24 (6th Cir. 2001) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000)). In other words, a plaintiff must show injury, causation, and redressability. Standing is determined based on the facts as they existed when the complaint was filed. *Id.* at 524.

In this case, Johnson agrees that if Bloodstock had standing at the time the Complaint was filed, then Bloodstock has standing now. Johnson does not dispute that Bloodstock had standing to sue in federal court at the time the Complaint was filed and admitted in his Reply that any loss of standing occurred as a result of the sale of assets. The parties agree that the sale of Bloodstock's assets, in whole or in part, occurred after the Complaint in this matter was filed on May 15, 2007. Thus, Bloodstock has standing to proceed in federal court because standing is determined at the time suit is filed.

In his Reply, Johnson attempts to clarify his standing argument by reformulating it in terms of the doctrine of mootness. "[M]ootness addresses whether [a] plaintiff continues to have an interest in the outcome of the litigation." *Cleveland Branch*, 263

-7-

F.3d at 525.  A federal district court has no authority to render decisions upon moot questions.  *Id.* at 530.  "A case becomes moot 'when the issues presented are no longer live or parties lack a legally cognizable interest in the outcome.'" *Id.* at 530 (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)).  The party claiming mootness must prove "the allegedly wrongful behavior cannot reasonably be expected to recur and interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id*. at 530-31 (quotation marks omitted).

Here, the issues of whether Johnson violated RICO and whether he breached the Membership Agreement remain live controversies and Bloodstock has a legally cognizable interest in the outcome of this case.  Johnson argues (1) that the sale of Bloodstock assets to CDTIC Acquisition, LLC ("CDTIC"), a subsidiary of Churchill Downs, Inc., means that Bloodstock can no longer be injured "in its business" or (2) that Bloodstock sold its interest in the case at bar to CDTIC.  [Def.'s Reply, at 4.]  Johnson has provided no evidence that the suit was sold to CDTIC.  In fact, in answer to Johnson's Interrogatory No. 10, Bloodstock stated that no subsidiary of Churchill Downs had a financial interest in the outcome of the present case.  [Def.'s Mot., Ex. 5, at 5-6.] Johnson's assertion that Bloodstock can no longer be injured ignores the fact that Bloodstock allegedly was injured by Defendant.  In short, the case is not moot because the effects of

-8-

the alleged RICO violations and breach of contract were not eradicated, by settlement between the parties or otherwise.

## B.  Verified Complaint

Johnson argues that Bloodstock's use of Bain's verified complaint ("Florida Complaint"), filed in another case, is neither probative nor adequate proof to defeat his motion for summary judgment.  Allegations contained in a verified complaint, signed under penalty of perjury, have the same force and effect as an affidavit for purposes of responding to a motion for summary judgment. *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008); *see* 28 U.S.C. § 1746 (unsworn declarations made under penalty of perjury may substitute for affidavit, *inter alia*).

In this case, under 28 U.S.C § 1746, the Florida Complaint does not have the same effect as an affidavit.  In the Florida Complaint, Bain makes the following declaration:

I, Ed Bain, hereby declare that:

. . .

2.  I have read the foregoing Amended Complaint and know the contents thereof, and believe the same to be true to my knowledge, except those matters therein stated to be alleged upon information and belief, and as to these matters I believe the same to be true, and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment or both, §1001 of Title 18 of the United States Code.

[Pl.'s Resp., Ex. 1, at 23.]  The Florida Complaint, and the declarations therein, were not subscribed under penalty of perjury.

The reference to § 1001 does not make the declaration punishable by perjury. *Cf.* 18 U.S.C. § 1001 (false statements made to federal government are criminally punishable but not if submitted by a party to a judge as part of judicial proceeding) *with* 18 U.S.C. § 1621 (criminally punishing false statements made under oath). As a result, some of Bloodstock's allegations are unsupported by any evidence in the record. However, there is sufficient evidence in the record to defeat Johnson's motion for summary judgment.

**C.  RICO Claim**

Johnson argues that Bloodstock cannot prove he violated RICO. RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Civil plaintiffs may bring a RICO suit in federal district court and can recover treble damages, costs, and attorney's fees. *Id.* § 1964(c); *see Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 481-83 (1985); *Central Distributors of Beer, Inc. v. Conn*, 5 F.3d 181, 183 (6th Cir. 1993) (criminal conviction not required, but conduct must be indictable). A RICO charge requires proof that (1) an enterprise exists which affects interstate or foreign commerce, (2) the defendant's association with the enterprise, (3) the defendant's participation in the

-10-

conduct of the enterprise's affairs, and (4) the participation was
through a pattern of racketeering activity. *United States v.*
*Fowler*, 535 F.3d 408, 418 (6th Cir. 2008).   Johnson argues
Bloodstock cannot prove (1) that he was part of any enterprise, (2)
that he intended to defraud Bloodstock, or (3) that there was a
pattern of racketeering activity.

### 1. RICO Enterprise

Johnson argues that he was not associated with any alleged
RICO enterprise and did not participate in the operation or
management of an enterprise.   Under RICO, an "enterprise includes
any individual, partnership, corporation, association, or other
legal entity, and any union or group of individuals associated in
fact although not a legal entity."   18 U.S.C. § 1961(4).   An
enterprise is "an entity . . . associated together for a common
purpose of engaging in a course of conduct. . . . [and] is proved
by evidence of an ongoing organization, formal or informal, and by
evidence that the various associates function as a continuing
unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981); *United*
*States v. Johnson*, 440 F.3d 832, 840 (6th Cir. 2006).   A RICO
enterprise must have "some structure, . . . but there need not be
much" and it is "organized in a manner amenable to hierarchical or
consensual decision-making." *Id.* (quoting approvingly *United*
*States v. Rogers*, 89 F.3d 1326, 1337 (7th Cir. 1996)).   Structure
can be provided in part by continuity and differentiation among

-11-

roles.  *Id.*

Additionally, a RICO plaintiff must prove the defendant participated in the operation or management of the enterprise. *Fowler*, 535 F.3d at 418.  "Operation or management" does not mean a managerial role; RICO is not limited to upper-level managers of a criminal enterprise.  *Id.* (citing *Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993)).  Rather, an enterprise may be operated by "lower rung participants in the enterprise who are under the direction of upper management."  *Id.*  A plaintiff must prove that defendant had "*some part* in directing the enterprise's affairs." *Id.*  "Some part" means either making decisions on behalf of the enterprise or knowingly carrying them out.  *Id.* (citing *United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994); *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 978 (7th Cir. 1995); *United States v. Starrett*, 55 F.3d 1525, 1548 (11th Cir. 1995)).

In this case, viewing the facts in the light most favorable to Bloodstock, Johnson was associated with a RICO enterprise and participated in its operation.  Johnson did not have to be a member of the LLC for there to be an enterprise.  The RICO enterprise was an informal association comprised of edbain.com, LLC, Bain, Sweeney, Johnson, and other unnamed defendants.  The enterprise had a common purpose of monetary gain to Bloodstock's detriment. Johnson testified that the enterprise needed his participation to

avoid the substantial cost of compiling race form data independently. Despite not receiving payment, Johnson expected payment for providing Bain with access to Bloodstock's database. The enterprise was structured in that Bain made decisions, Sweeney devised a way to access the data without arousing attention, and Johnson and others gathered necessary data through their accounts. Johnson testified that he knew of other data gatherers in addition to Bain and Sweeney's roles.

Bloodstock also put forth evidence that Johnson participated in the RICO enterprise. Bloodstock argues Johnson had ultimate control over the enterprise based on his ability to stop the enterprise by blocking access to Bloodstock, but this is hardly proof that he conducted the enterprise. Rather, Johnson participated in the enterprise by providing Bloodstock data and later acquiescing in the enterprise's efforts to gather statistics using his Bloodstock user name and password. Johnson had "some part" in the enterprise because he knowingly carried out the enterprise's decision to defraud Bloodstock. There is evidence in the record upon which a jury reasonably could find Johnson was associated with and participated in a RICO enterprise.

**2. Racketeering Activity**

Johnson argues that Bloodstock cannot prove his specific intent was to defraud Bloodstock and, thus, cannot prove that he engaged in any racketeering activity. Racketeering activity

-13-

includes "any act which is indictable under . . . title 18, United States Code . . . section 1343 (relating to wire fraud)." *Id*. § 1961(1); *Brown v. Cassens Trans. Co.*, 546 F.3d 347, 352 (6th Cir. 2008). Bloodstock claims that Defendants engaged in wire fraud. To prove a defendant committed wire fraud, the plaintiff must show "(1) a scheme or artifice to defraud; (2) use of interstate wire communications in furtherance of the scheme; and (3) intent to deprive a victim of money or property." *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003); 18 U.S.C. § 1343.

"A scheme to defraud includes any plan or course of action by which someone intends to deprive another by deception of money . . . or property by means of false or fraudulent pretenses, representations, or promises." *Daniel*, 329 F.3d at 485-86. The plaintiff must prove the defendant made a material misrepresentation, but actual reliance by the plaintiff is not required for wire fraud. *Id.* at 486; *Brown*, 546 F.3d at 356 (citing *Bridge v. Phoenix Bond & Indem. Co.*, --- U.S. ----, 128 S. Ct. 2131, 2145 (2008)). Wire fraud is a specific intent crime, meaning "a defendant must act with specific intent to defraud." *United States v. Vasilakos*, 508 F.3d 401, 409 (6th Cir. 2007). Wire communication must be employed for the purpose of executing the scheme or artifice. *Daniel*, 329 F.3d, at 489 (citing 18 U.S.C. § 1343).

Here, viewing the facts in the light most favorable to

-14-

Bloodstock, there is evidence suggesting that Johnson intended to defraud Bloodstock. The parties do not dispute that there was a scheme to defraud or that wire communications were used in furtherance of the scheme. Instead, Johnson argues only that he lacked the specific intent to defraud. In his deposition, Johnson admitted that he provided Bain with data from Bloodstock and that he later allowed Bain to access his Bloodstock account. The admission does not prove he knowingly participated in the scheme to defraud. However, Johnson's decision to provide Bloodstock data and access to Bloodstock data was neither inadvertent nor done in good faith. Johnson knew a similar racing statistics service, Equibase, asked for $60,000 to $70,000 per year in order to allow Bain to resell its data online. He knew Bain was seeking investments to cover this cost. Johnson also knew Bloodstock would not allow Bain to access data and resell it without remuneration.

Additionally, Johnson knew Sweeney devised a way to mask IP addresses so that the enterprise could access Bloodstock's database undetected. Furthermore, he knew Bain had and sought other sources to access Bloodstock. Finally, Johnson knew that he made a material misrepresentation, namely that he accessed his Bloodstock account for his personal use. Johnson knew Bloodstock would reasonably rely on the misrepresentation and provide the racing statistics to someone it believed was an account holder. Johnson knew that the misrepresentation would deceive Bloodstock into

-15-

providing data to a party that intended to repackage and resell it without permission.   In short, there is ample testimony from Johnson upon which a jury could reasonably find that his specific intent was to defraud Bloodstock.

### 3.  Pattern of Racketeering Activity

Johnson argues that Bloodstock cannot prove a pattern of racketeering activity.  A "pattern of racketeering activity" means at least two acts of racketeering activity committed within ten years of each other.  18 U.S.C § 1961(5).  In order to prove there is a pattern, a RICO plaintiff must show: (1) that the racketeering predicates are related and (2) that they amount to or pose a threat of continued criminal activity.  *Brown*, 546 F.3d at 354 (citing *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).  A pattern of racketeering activity does not prove the existence of a RICO enterprise, but the same evidence can support both elements.  *Turkette*, 452 U.S. at 583; *Johnson*, 440 F.3d at 840.   "A relationship among predicate acts is established when [the acts] have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  *Id.* (internal quotation marks omitted).

In this case, viewing the facts most favorably to Bloodstock, the predicate acts of wire fraud alleged by Bloodstock are related. The communications via the internet were intended to gather racing

statistics in order to resell them without fully compensating Bloodstock. The communications were made from Johnson, a member of the enterprise, to Bloodstock. Johnson provided the means by which the enterprise could directly access Bloodstock's database. Bloodstock was the victim of the unauthorized downloads that occurred over a ten month span. Johnson argues the communications were all part of one scheme and therefore there is an insufficient number of predicate acts. However, each use of the internet in furtherance of the scheme to defraud was a predicate act and there were at least two downloads. *See* 18 U.S.C. § 1343. Moreover, each time the database account was accessed was a misrepresentation to Bloodstock.

Continuity may be demonstrated in a number of ways and "'is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.'" *Id.* (quoting *H.J., Inc.*, 492 U.S. at 241). Closed-ended continuity can be shown "by proving a series of related predicates extending over a substantial period of time." *Id.* The Sixth Circuit has held that closed periods of seventeen months and six to seven months are not a substantial period of time. *Vemco, Inc. v. Camardella*, 23 F.3d 129, 135 (6th Cir. 1994); *Vild v. Visconsi*, 956 F.2d 560, 569 (6th Cir. 1992). Here, Johnson argues that the predicate acts did not span a substantial period of time under the closed-ended

continuity analysis.  The Court agrees and Bloodstock does not
dispute this point.

   "When a lawsuit is brought before the plaintiff can show
activity over a long period of time, the crucial showing is
'whether the *threat* of continuity is demonstrated.'"  *Vemco, Inc.*,
23 F.3d at 134 (emphasis original).  Open-ended continuity may be
established with a small number of related predicates, occurring
close in time, so long as the acts include a "specific threat of
repetition extending indefinitely into the future."  *Brown*, 546
F.3d at 354.  Additionally, "'[t]he continuity requirement is
likewise satisfied where it is shown that the predicates are a
regular way of conducting defendant's ongoing legitimate business
(in the sense that it is not a business that exists for criminal
purposes) . . . .'"  *Id.* (quoting *H.J., Inc.*, 492 U.S. at 243).

   In this case, viewing the facts in the light most favorable to
Bloodstock, the predicate acts of wire fraud alleged by Bloodstock
posed a threat of continued criminal activity.  Johnson argues that
there is no threat of repetition because Bloodstock sold its assets
after this suit commenced.  However, Defendants stopped their
activity only after learning of the suit.  In fact, the nature of
the communications with Bloodstock cuts for finding a threat of
repetition.  Johnson's testimony suggests the enterprise took steps
to avoid detection, including using existing account holders'
passwords and user names, masking IP addresses, and spreading the

-18-

downloads among multiple account holders. The nature of the edbain.com business suggests a constant need for Bloodstock racing statistics in order to give its customers viable information. The downloads were necessary for the legitimate side of the enterprise's business. In conclusion, there is evidence in the record on which a jury could reasonably find a pattern of racketeering activity.

The Court will deny summary judgment on the civil RICO claim. Johnson's testimony provides more than a mere scintilla of evidence upon which a jury could reasonably find for Bloodstock. On the RICO claim, Johnson has not met his burden of showing an absence of a genuine issue of material fact or an absence of evidence on a material fact that Bloodstock must ultimately prove.

**D.   Breach of Contract Claim**

Johnson argues that Bloodstock cannot prove damages from an alleged breach of contract. In Kentucky, a breach of contract plaintiff must show (1) the existence of a contract, (2) breach of that contract, and (3) damages resulting from that breach. *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. App. 2007).

In this case, Johnson contends that there is no evidence in the record of Bloodstock's damages as a result of any breach of the Membership Agreement. Bloodstock's response points to Johnson's testimony as evidence of damages from the breach of the Membership

Agreement.  In Bloodstock's Answers to Johnson's Interrogatories, Bloodstock stated: (1) the commercially reasonable value of the data misappropriated is $4,000 per month, (2) records of Bloodstock subscriber charges are no longer in its possession, and (3) Bloodstock did not have an established rate for customers authorized to resell its racing statistics.  [Def.'s Mot., Ex. 5, at 2, 3.]  Johnson seizes on the fact that Bloodstock no longer possesses its records to argue there is no way for it to prove breach of contract damages.  However, Johnson testified that Equibase, a handicapping service similar to Bloodstock, asked for between $60,000 and $70,000 per year to allow Bain to resell racing statistics.  Divided by twelve months, this amounts to between $5,000 and $5,833 per month.  The fact that a comparable service has established a commercial handicapping resale rate of roughly $5,000 might lead a jury to reasonably conclude that Bloodstock, having never established such a rate, has suffered damages from the breach of the Membership Agreement in the amount of $4,000 per month.

Johnson argues that the Court lacks jurisdiction over this claim because the amount in controversy does not exceed $75,000.  Johnson misunderstands this Court's jurisdiction over such claims.  Bloodstock's RICO claims are properly before the Court under its federal question jurisdiction.  28 U.S.C. § 1331; 18 U.S.C. § 1962.  The breach of contract claim is also properly before the Court

-20-

under its supplemental jurisdiction.  28 U.S.C. § 1367.  The amount in controversy is an issue under diversity jurisdiction, which is not the basis for jurisdiction here.  *Id.* § 1331.

The Court will deny summary judgment on the breach of contract claim.  There is ample evidence, taken in the light most favorable to Bloodstock, that Johnson breached the Membership Agreement he signed as a condition to gaining access to Bloodstock's online racing statistics database.

**IV.  CONCLUSION**

Defendant Johnson has failed to demonstrate that he is entitled to summary judgment as a matter of law.  Plaintiff has come forward with deposition testimony from Defendant Johnson that tends to support its RICO and breach of contract claims.  A jury might reasonably find for Plaintiff on either claim.

Accordingly, **IT IS ORDERED** that Defendant Johnson's Motion for Summary Judgment [Record No. 62] be, and the same hereby is, **DENIED**.

This the 7th day of April, 2009.



Signed By:

*Joseph M. Hood*

Senior U.S. District Judge

-21-